THE PEOPLE, By the ATTORNEY GENERAL, On the Relation of JOHN BOYER, v. M. E. TEAGUE.

*Pleading—Sufficiency of Complaint—Bill of Particulars—Jury—Challenge to Array—Sheriff Interested in Action—Qualification of Electors—Domicile—Intent—Evidence—Declarations of Electors—Circumstantial Evidence—Evidence as to whom Elector voted for—Exclusion of Votes when not to Defeat an Election—Province of Jury as to Whether There is Any Evidence—Burden of Proof—Issues, Form and Number—Registration — Removal — Persons Under Imprisonment — Illegal Votes—Registration on Election Day—Acts of Registrar Outside of Township.*

1. In an action involving the title to the office of Sheriff, a complaint which alleges the aggregate number of illegal votes alleged to have been cast for the defendant, the grounds upon which the charges of illegality are based as to each class, and when and where the votes were polled, the defendant, upon his motion for a "bill of particulars," cannot claim as of right a fuller and more definite specification of what the relator expects to prove.

2. In such case, it is not requisite that the plaintiff should be required to give the defendant the name of every alleged illegal voter as to whom he proposes to offer proof.

3. Where, upon a challenge to the array, it appeared that the jury was drawn for a special term of the Court, called mainly to try an action involving the Sheriff's title to his office; that the Sheriff (who was the defendant in such action) had taken charge of the drawing of the jury, receiving the scrolls as they were drawn by a boy, calling the names without submitting more than two or three to the inspection of any other person, and passing them into a locked box; and it also appeared that one name that ought to have been in box No. 2 was again found in box No. 1: *Held*, that the drawing was irregular, and the array was properly set aside, although the drawing took place in the presence of the Board of County Commissioners in regular session.

4. Where, in such case, upon challenge to the array, the same was set aside for irregularity, the Court had power, under chapter 441, Laws 1889, to appoint a suitable person to summon a jury from the by-standers.

5. The Act of 1889, ch. 441, providing for the summoning of a jury from the by-standers, in cases where the Sheriff is interested, &c., is applicable to actions brought before its passage.

6. A person, in order to become a qualified elector in this State, must have come into the State a year before the election, or have been domiciled within it for twelve months after forming the purpose to remain, and the same intent must be concurrent with the actual occupation of a domicile in the county in order to entitle him to the rights of an elector within its limits.

7. The question of domicile is often a question of intent, and the declarations of a voter as to his qualifications, if made at the time of voting, are admissible in evidence as part of the *res gestæ;* and, if not contemporaneous, but made previously, are admissible, if such declarations are in disparagement of his right.

8. An honest elector, who has observed the law, enjoys the privilege, which is a personal one, of refusing to disclose, even under oath as a witness, for whom he voted.

9. As between contestants for an office, the testimony of an elector, if pertinent and relevant, is always admissible.

10. Neither contestant nor contestee are called upon to contend for the rights of a witness who does not demand protection, and if com-

106—37

pelled to testify against his will, the testimony, competent without objection on his part, should go to the jury for what it is worth.

11. The Judge who tries the case may, in the exercise of his discretion, determine (if there is any evidence at all) how much testimony tending to show the illegality of a particular vote is sufficient as a foundation for compelling the voter to tell for whom he voted.

12. Where it does not appear from direct testimony for what candidate a voter voted, circumstantial evidence tending to establish the fact is admissible.

13. The fact that a certain person engaged in handing out tickets for a certain candidate, and for no other person, and that he gave tickets to one W. and "voted him," is admissible in evidence and tends to show for whom W. voted.

14. It is competent to show that a man voted in a certain township; that he had been a resident of another township the previous spring; had been indicted under a different name, and convicted and imprisoned; had escaped jail and had not lived in the township in which he voted for two or three years before the election. The identity of the man being established, the record of his indictment, &c., was admissible, not to disqualify him for crime, but to prove the fraudulent voting.

15. A witness is competent to testify to a fact, of the truth of which he says that he feels "reasonably certain."

16. The exclusion of legal votes, not fraudulently, but through error of judgment, will not defeat an election, notwithstanding the error is one which there is no mode of correcting, even by the aid of the Courts, since it cannot be known with certainty afterwards how the excluded electors would have voted, as it would obviously be dangerous to receive and rely upon their subsequent statements as to their intentions, after it is ascertained precisely what effect their votes would have upon the result.

17. The defendant requested the Court to charge the jury that there was no evidence, or not sufficient evidence, to warrant the jury in deducting from defendant's vote the votes of certain named persons. His Honor charged that, where there is no evidence tending to prove *an issue*, it is generally the duty of the Court to so declare, but a separate issue has not been framed or submitted as to each vote, and left it to the jury to determine whether there was any evidence, and if so, whether it was sufficient to convince them, by a clear preponderance, that the votes were illegal, bearing in mind all the rules of law laid down by the Court.

18. When an elector is allowed to deposit his ballot, the burden is on one who questions its validity to show, by a preponderance of testimony, the truth of such facts or circumstances as are relied upon to establish the disqualification.

19. The form and number of the issues submitted must be determined by the Judge who tries the case, in the exercise of a sound discretion, except that they must be such as that the Court can proceed to enter judgment upon the responses. and that the appellant shall lose no opportunity to present to the Court below, and, on appeal, to this Court, any view of the law applicable to the evidence.

20. When a voter is registered in a precinct, and desires to move to another in the same county, he must procure a certificate before he can vote or lawfully register in the other precinct. If he fails to get this, and registers without it, the vote is illegal and should not be counted.

21. When a voter resides on or so near the precinct line, or the line be so uncertain that it is doubtful in which precinct the voter lives, and the voter, honestly and in good faith, *bona fide*, registers and votes in the precinct he, in good faith, alleges and believes he lives in, and has good reason to believe he is correct, and registers and votes in no other precinct, such vote is legal.

22. If a person in jail for misdemeanor (not infamous), and sentenced to imprisonment, escapes, and, before he is recaptured, his term or sentence expires, and he votes in his own precinct, in which he resided before he was sentenced, such vote is valid if the voter be otherwise qualified; but, if the voter is a fugitive from justice, and hiding from one part of the county to another, and voted in the precinct he happened to be in, and not in the precinct of his residence when sentenced, such vote is illegal.

23. If a voter was previously registered in one township, and his name still appears on the registration books, not erased, and he registers and votes in another township without any certificate having been granted, such vote is illegal.

24. Any registration on the day of election is invalid, unless the voter becomes of age on that day, or shows that, for any other good reason (of which the judges of election are to determine), he has become entitled to vote.

25. Where a registrar receives a certificate of removal outside of the township for which he is acting, administers the proper oath to the voter, and enters his name on the registration book after his return home, although he did not have the book with him, such registration is valid.

This was an ACTION, tried at the Special Term, January, 1889, of the FORSYTH Superior Court, before *Brown, J.,* and was commenced to try the title to the office of the Sheriff of Forsyth County. The election had been held on the 6th day of November, 1888, and the defendant had been duly declared elected, and was inducted into said office. The relator of the plaintiff was the opposing candidate, and claimed that illegal votes had been cast for the defendant in sufficient numbers to nullify his election and give title to the relator. The defendant, on his part, alleged that numbers of illegal votes had been cast for the relator, and that these should be deducted from the relator's aggregate. All this, as well as other pertinent matters, is fully and particularly set out in the pleadings.

The facts material to the discussion of the first, second, third, eighth, ninth, tenth, fifteenth and sixteenth exceptions are embodied in the opinion of the Court.

The plaintiff filed a challenge to the array of the jury, drawn for the said special term, before the jury were called and empanelled and in due time.

The said challenge is set out in full in the transcript herewith sent.

Issue being joined as to the said challenge to the array, the same was tried by the Court, the witnesses being examined before his Honor, the presiding Judge, who upon the evidence adduced, found the following facts, the defendant offering no testimony:

### THE FINDINGS OF FACT AND ORDER.

" That a special term of this Court was ordered to be held for the trial of civil business, commencing January 6, 1890, and that such Court was duly ordered prior to December 1, 1889; that at the December (1889) meeting of the Board of Commissioners of Forsyth County, the Board proceeded to

draw the jurors for said special term; that said jurors were drawn in manner as follows, to-wit: The Board being in regular session, the Sheriff, M. E. Teague, the defendant in this action, brought into the Commissioners' room a boy under ten years of age and opened box No. 1; that the boy drew out a scroll containing a name of a juror from said box, and handed it to the said Sheriff, who read the name thereon and undertook to call it out; that none of the Commissioners read or saw the name on said scroll, and no one else did, except said Sheriff, who immediately put said scroll into box No. 2; that each scroll was read and drawn in this way, without any one seeing the name thereon, except said Sheriff, until twenty-four jurors were drawn from box No. 1, and put in box No. 2 by said Sheriff; that there were one or two scrolls that the Clerk to the Board, or some other person, assisted the Sheriff to read, but no more.

" That it appears that nine (9) of said jurors were from Clemmonsville township, much the smaller township in the county, with a voting population of from 125 to 150; that only one juror came from Winston township, which has a voting population of 1,800, and one juror only from South Fork township, a very large township, and none from Kernersville, another large township.

" That the Chairman of the Board, and the Clerk wrote down such names upon the list of jurors as Sheriff Teague called out, and the list was put in the hands of said Sheriff, who summoned or caused said jurors to be summoned.

" That Clemmonsville township, up to March, 1889, was a part of Davidson County, and by Act of Assembly was made a part of Forsyth County; that at September (1889) meeting, the Commissioners of Forsyth caused the names of fifty-seven persons from said township to be placed in the jury box; that they selected said persons from the tax-lists of 1889, and which went into the Sheriff's hands in Sep-

tember, 1889, and also from a list furnished them by the Register of Deeds of Davidson County, and also called in one Womack, who resided in Clemmonsville township to assist them.

"That at the time of the drawing of the jurors at said December meeting, it was well known by said Teague, and by the people of the county generally, that the cause now on trial would be tried during the first week of the special term, and that the said special term was called largely with the view to afford time to try this cause.

" It also appeared that the Commissioners, for more than five past years, have drawn the scrolls from box No. 1, and put them in No. 2, without exhausting No. 1, and that during the past five years the scrolls in No. 2 have not been returned to No. 1; that W. N. Best was drawn as regular juror from box No. 1 for October Term, 1885, and that he is now also drawn as a juror again out of box No. 1 for this term, and the same as to one other of the present jurors, who was duly drawn before for October Term, 1887.

" That the plaintiff Boyer was Sheriff for four years preceding the defendant, and that he used to be present generally with the Commissioners when jurors were drawn, and sometimes read out the names on the scrolls, and sometimes a Commissioner did it, but plaintiff stated that he then had no suits in Court, or cases on docket.

" This plaintiff also testified that he was present a short while, casually, at September (1889) meeting of the Board of Commissioners, when they were revising the jury lists, and the chairman asked his opinion of one or two men, and he gave it; that he took no part in the proceedings, and was there only a few minutes.

" It further appears that at September meeting, 1889, (since passage of the act of 1889), the Board of Commissioners of Forsyth County proceeded to revise, generally, the entire jury lists and boxes, and took out many names and

put in others, and that they had the tax-lists, levied in June, 1889, before them, and revised the lists from them, and that two persons, residents of Davidson County, were placed in said boxes.

"The Court finds the above facts from the testimony offered by the plaintiff, on his motion to challenge and set aside the array. The defendant offered no evidence.

" In sustaining plaintiff's challenge to the array, upon the facts hereinbefore stated, the presiding Judge stated that he did not find an actual, intentional fraud, but it was very irregular and gross negligence upon the part of the Board of Commissioners to permit the defendant Teague to draw this jury for this special term, called principally to try this cause, and to solely read and call out the names on the scrolls, no one else examining or verifying the same, as set forth in the evidence, and that he could not give judicial sanction to so grave an irregularity.

"The Court sustained the challenge and set aside the array, to all of which the defendant, in due time, objected and excepted."

The following is a statement by the Court:

" The Court having set aside the array of jurors upon challenge of the plaintiff, and having made an order concerning the same, the defendant appeals from said order, and asks a stay of the trial until said appeal is heard." Declined by the Court. Exception by defendant. [Error and exception No. 4]

The Court having set aside the array, as above recited, directed that a jury be drawn in accordance with section 1732 of *The Code.* The plaintiff's counsel insisted that the talesmen should be called from the by-standers, the defendant contending that the jurors should be drawn under section 1732 of *The Code;* but the plaintiff acquiescing, the drawing took place in the presence of the Court.

The panel so drawn was returned, and thereupon defendant challenged the array, but not because it had been drawn under section 1732 of *The Code.* Testimony having been taken, his Honor sustained the challenge, and the second panel was set aside, and the plaintiff did not except.

The Court thereupon appointed Samuel H. Smith (in accordance with the act of 1889, ch. 441, ratified March 11th) to summon jurors from the by-standers, which was done, the jury being entirely made up from the by-standers so summoned by the said Smith; and to this the defendant objected and excepted. [Error and exception No. 5.]

The testimony bearing upon the exceptions, from the eighth to the sixteenth, both inclusive, is sufficiently set forth in the opinion of the Court.

The defendant's prayer for instructions was as follows:

1. A residence of twelve months in the State and ninety days in the county entitles a citizen to vote.

2. If it appears that the voter whose ballot is attacked for non-residence has resided in the State twelve months, and in the county ninety days, the presumption is raised that he is entitled to register and vote, and it will take affirmative evidence to remove the presumption.

3. The fact that a voter goes from the county in which he has voted, immediately after the election, does not raise the presumption that he has voted illegally, nor that he is a non-resident. [See charge.]

4. The fact that a voter removes into a county, if such removal is more than ninety days before the election, and that he goes into another county, or State, immediately after the election, even if to change his residence, does not destroy the presumption that he has voted legally, provided he was a resident of the State for twelve months before the election.

5. Temporary absence from a county, even beyond the confines of the State, for the purposes of business or pleasure,

does not take from a citizen his domicile, and the right to vote.

6. If a vote is challenged for any cause, and the challenge is tried by the judges of election, and the decision is in his favor, it strengthens the presumption that he is a legal voter, which must be removed by evidence.

7. The residence, or domicile, of a voter is determined by his intention.

8. The fact that a citizen registers and votes is evidence of his intention as to residence. (The charge does not embody this instruction, but it should do so). [Error and exception No. 19.]

9. If a voter has lived twelve months in the State and ninety days in the county, and does not intend to become a citizen of the county where he votes until the time of his registration, his vote, if cast, is lawful. (Overruled by Judge's charge. See also proposed instruction No. 24). [Error and exception No. 20.]

10. The provisions of section 2680, of the Election Law, that the "residence of a married man shall be where his family resides," does not necessarily imply that his family consists of his wife alone. [See charge.]

11. If a voter's wife abandons him, or separates from him, without his fault, it does not affect his domicile.

12. If a voter's wife refuses to go with him to the place where he decides to have his domicile, his right to vote in the new place of residence is not thereby affected.

13. A voter may be lawfully placed upon the registration book of a precinct, if the registrar receives from him the certificate of removal under section 2681 of the Election Law, and administers the necessary oath to the voter in another precinct, not having the registration book then present, but putting the voter's name therein afterward, within the rightful precinct. This instruction applies to the case of Cons. Brooks, of Abbott's Creek precinct.

14. The judges of election have the right, within their reasonable discretion, to permit the registration of a voter on election day, under section 2682 of the Election Law, although such registration may be for a cause other than that the voter has become of the age of twenty-one years on the day of election; and when a voter is so registered he has the right to vote.

15. Evidence which might have been sufficient to put the voter to his explanation, if challenged at the polls, is not sufficient to prove a vote illegal, after it has been admitted.

16. After a vote has been admitted, something more is required to prove it illegal than to throw doubt upon it.

17. The declaration by the Board of Commissioners of Forsyth County of the election of M. E. Teague as Sheriff, establishes a *prima facie* right in his favor to the said office.

18. If a vote has been received by the judges of election and counted in the returns, and the relator (Boyer) questions the legality of the same, the burden of the proof is upon him to satisfy the jury, by affirmative evidence, that such vote was illegal and improperly received and counted for the defendant (Teague). [See charge.]

19. If the registrar in Winston precinct, in giving a certificate of transfer to Samuel H. Belton, to Broadbay precinct, failed to enter the fact in, and erase his name from, the registration book of Winston precinct, such failure on the part of said registrar does not disqualify the voter thus transferred from voting in Broadbay precinct.

[*Note by the Judge.*—Admitted and agreed in argument that this be not deducted from Teague.]

20. If the registrar of Winston precinct, through mistake, in the certificate of transfer of Sam. H. Belton, wrote the name "S. H. Belden," instead of the correct one, this would not disqualify the said Belton as a voter in Broadbay precinct.

[*Note by the Judge.*—The Court did not charge on this, as during the argument it was agreed by counsel, before the

jury, that it be counted for Teague and not deducted from the Teague vote.]   [See charge.]

21. If the jury believe, from the evidence, that the registrar of Winston precinct, by mistake, wrote into his registration book the name of "Boldin" Brooks instead of "Golden" Brooks, and that the said "Golden" Brooks was actually registered as "Boldin" Brooks, and voted at the election in controversy, it would be their duty to count his vote for the defendant.   [See charge.]

22. If Ed. Conrad, *alias* Ed. Jones, a registered voter in Bethania precinct, was convicted of an offence, not infamous, and sentenced by the Court to imprisonment, and escaped during the term thereof, and went at large, and while thus at large (the time for which he was sentenced having expired) cast his vote for M. E. Teague for Sheriff, being otherwise qualified to vote, the ballot thus given is not illegal.   (See Judge's charge.)   It is assigned for error that the charge so modifies the instruction prayed for as to destroy its rightful effect, and is misleading.   There is no evidence to sustain the assumptions of the charge.   If so, it should be rehearsed to the jury.   [Error and exception No. 21.]

23. The defendant contends, and asks the Court to charge the jury, that there is not sufficient evidence to sustain the allegations and contentions of the plaintiff, that the votes of the following persons should be thrown out and not counted for the defendant, namely:

*Tom Hanes, Frank Fowler, Thomas Lee,* PAUL HARRIS, CHES. HOWELL, JOHN HILL, F. E. SETZER, GEORGE JAMIESON, WALLACE MOORE, WILLIAM (or JACK) FOY, *George Foy, H. L. Young, Ed. Davis,* JAMES HANSBERRY, *Charles Yokely, Creed Hairston, James Brown,* PETER FOY, *Bob Moore, William Holmes.*

[See Judge's charge.]   The Court says it is admitted by the plaintiff that he has not offered evidence sufficient to

show the illegality of the votes of the persons above designated by SMALL CAPITALS, nor for whom they voted.

In the charge, in the *italicised* part, the Judge refuses to charge the jury in accordance with the prayer for the instruction No. 23, so far as the names above *italicised* are concerned ; and this the defendant assigns for error, in connection with the refusal of the Judge to allow the " issues" proposed by the defendant. [Error and exception No. 22.] [See charge, where the issues proposed by defendant, and the ruling of his Honor, are fully set out.]

24. The question of residence being controlled by the intention of the voter, and William Belies, a witness for plaintiff, having sworn that he had decided to make Old Town his home at the time he registered and voted, and that he had been living in Old Town for a year or more before then, continuously, and that at the time he voted, he considered Old Town his place of residence, he is a lawful voter, and should be counted for Teague. [See instruction 9.] This is identical with it; and, being overruled, is likewise assigned as error. [Error and exception No. 23.] (See charge.)

25. That registration is an essential prerequisite of suffrage, and when the registration of a voter is made by the lawful officer, such registration furnishes *prima facie* evidence of the right to vote. (See charge.)

26. John Below having testified that he was less than twenty-one years of age when he voted, and that he voted for the relator, Boyer, and there being no evidence to the contrary, the said vote must be lost to Boyer. (See charge.)

27. It appears from the evidence that Lorenzo Wise was registered in Salem, and that he there voted for Teague. His name was also in the registration book of Winston, followed by the word " removed." The presumption is that

the said word "removed" was written by the authorized officer, and the record must be taken as true, unless proof is made by plaintiff that such word was written therein fraudulently; and the vote in the Salem precinct must be counted for Teague. (See charge.)

[The defendant assigns for error that part of the charge evidently relating to this instruction. The words of the charge are calculated to mislead the jury.] (Error and exception No. 24.)

28. It appears from the evidence that Henry Goings voted for Boyer in Winston, and that his residence was beyond the limits of that precinct when the vote was cast. If the testimony is believed by the jury, they should throw out the said vote and not count it for Boyer. [See charge.] [Error and exception No. 25.]

29. There is no evidence for whom the following persons voted, and therefore their votes should not be lost to Teague, namely: John Hill. Ed. Davis, Wallace Moore, William (or Jack) Foy, George Jamieson, and Tom Hanes.

[See charge. The notes under the proposed instruction, No. 23, apply to this, No. 29. Error is assigned for the same cause.] [Error and exception No. 26.]

30. There is no evidence as to the non-residence of the following persons and, therefore, their votes should not be lost to Teague, namely: F. E. Seitzer, Ches. Howell, Thomas Lee, and Paul Harris.

[See charge. The notes to instructions 23 and 29 apply to No. 30, so far as the name Thomas Lee is concerned. Error is assigned for the same cause.] [Error and exception No. 27.]

31. The proof being that W. W. Self and John Bullen had not resided in the county ninety days before they voted for Boyer, the jury, if they believed the evidence, should throw out said votes and not count the same for Boyer.

32. It appearing, without contradiction, from the testimony of Clayton Snider, that he removed from Abbott's Creek to Kernersville, without any certificate of removal, and voted for Boyer in the latter precinct, the jury, if they believe the testimony, should throw out said vote and not count the same for Boyer.

[*Note by the Judge*—Admitted in the argument that this vote is illegal, and should be deducted from Boyer.]

The foregoing proposed instructions were signed by defendant's attorneys and filed with the Clerk of the Court.

Next comes the written charge of his Honor, as read to the jury.

Before reading the written charge, the Court said to the jury that while something had been said by witnesses and attorneys about Democrats and Republicans, as indicating the political parties to which the plaintiff and defendant belonged, that the jury should be careful not to allow any such expression, or consideration, of this sort to influence them in the least; that they must guard against the influence of such expressions and decide the case solely upon the testimony, and nothing else.

### THE CHARGE.

This is a civil action in the nature of a *quo warranto*, brought in the name of the people of the State by the Attorney General, upon the relation of John Boyer, against the defendant, to recover possession of and try the title to the office of Sheriff of Forsyth County. The plaintiff alleges that he was duly and legally elected to that office at November election, 1888; that he received a majority of the qualified and legal votes cast at said election. It is admitted by the plaintiff that defendant Teague, according to the return made by the judges of the various election precincts and by the legally authorized canvassing board, has an

apparent majority on the face of said return of twenty-four votes.

Here the Court read from the evidence the votes given for the relator Boyer and defendant Teague, at each precinct in the county, which was as follows:

|  | BOYER. | TEAGUE. |
|---|---|---|
| Abbott's Creek precinct | 40 | 135 |
| Ballew's Creek precinct | 92 | 97 |
| Bethania | 173 | 163 |
| Broadbay | 110 | 202 |
| Kernersville | 186 | 173 |
| Lewisville | 135 | 86 |
| Middle Fork | 67 | 193 |
| Old Richmond | 110 | 96 |
| Old Town | 179 | 89 |
| Salem | 326 | 267 |
| Salem Chapel | 83 | 139 |
| South Fork | 165 | 160 |
| Vienna | 118 | 88 |
| Winston | 636 | 556 |
| Total | 2420 | 2444 |
|  |  | 2420 |
| Teague's majority |  | 24 |

You are instructed that the findings of the county canvassers and the returns of the judges of election are not conclusive, but that those findings and returns, together with the induction into office of the defendant by the Commissioners, established a *prima facie* right to the office by the defendant, and the Court charges you that so far as the action of the Commissioners and the returns go, the induction into office of the defendant Teague was *prima facie* legal and proper, and clearly establishes a *prima facie* right in behalf of the defendant, which the relator must overthrow by testimony. [Instruction 17.]

The relator claims that the defendant received a large number of illegal votes in the precinct of Winston and other precincts of the county, sufficient, if deducted from defendant's apparent majority, to wipe out that majority and leave a fair majority for relator Boyer. The defendant Teague replies that he denies the receiving of alleged illegal votes, or that they were illegal, and further, that relator Boyer, himself, received illegal votes, which is denied by Boyer.

The issues submitted to you require, upon your part, the careful examination of each vote attacked by the relator Boyer, and each vote attacked by defendant Teague. By the word attacked, I mean " alleged to be illegal."

The burden of proof is upon the relator Boyer, to satisfy you that, after all the alleged illegal votes are deducted from the person's column of votes for whom they were cast, that he (Boyer) received a majority of the legal and qualified votes cast for Sheriff in November, 1888. [Instruction No. 18.] The relator is not compelled to prove this beyond a reasonable doubt, but by a clear preponderance of the evidence only. The relator's evidence must preponderate, but he is required to show nothing in this case beyond a rea-onable doubt. As before stated, the returns are only a *prima facie* case for defendant. You have the right, and it is your duty, to go behind those returns and examine into the actual legality of each vote concerning which evidence has been given in this cause—if a vote be illegal, to determine for whom it was actually cast. The relator has introduced evidence concerning a large number of votes which he has attacked—some sixty-five or seventy—the exact number of which the Court will not undertake to state, but leaves that to you,.as you have been taking very extensive notes, I am glad to notice, and paying great attention to the evidence.

You should take the returns from each precinct (all are in evidence) of the county and give Boyer and Teague credit

for the number of votes each received and apparent on the face of the returns. You should commence a careful examination of the testimony in respect to the illegal votes cast in each precinct. If you are satisfied that a person voted for Teague, in a certain precinct, and that such vote was illegal, you should deduct that vote from the number received by Teague at such precinct, as appears on the returns. So if the evidence shows, by a preponderance, that a certain vote was cast for Boyer, and that it was illegal, then you should deduct that vote from the number received by Boyer, as appears on the face of the returns. So you should patiently and conscientiously canvass and weigh the evidence as to each vote attacked by either party to this action.

After you have gone through all the testimony and deducted from Teague or Boyer, as the case may be, each vote actually cast for either, which you may find to be illegal, you will then ascertain which of them received a majority of the remaining legal votes actually cast at last election in November, 1888. Whichever received a majority of all the legal votes cast at said election, is the person lawfully elected. If you find that Boyer received such majority, you will answer the first issue Yes and the second issue No.

If the plaintiff has failed to satisfy you, by a clear preponderance of evidence, that he was so elected, then you should answer the first issue No and the second issue Yes; bearing always in mind that the burden of proof is on Boyer to satisfy you by a preponderance of evidence on both issues, viz., that he was, and that Teague was not, legally elected. [Instruction 18]

This brings us to the consideration of the various grounds and causes whereby certain votes are claimed to be illegal.

It is essential that relator show, by a preponderance of evidence that the alleged illegal vote was cast for Teague. If he fails, in any case, to show this, then you should not

deduct the vote from the Teague column.  And so it is essential for Teague to show that a vote he claims to be illegal was actually cast for Boyer, before you deduct it from Boyer's column.

Now as to the legality of votes:

The fact that a man was registered in a certain precinct and was permitted by the judges to vote in said precinct, establishes a *prima facie* case that such vote is legal, and you must have evidence sufficient to establish, by a clear preponderance, that such vote was in fact illegal, before the *prima facie* right is overcome. ˙ [Instruction 25 ]

What constitutes the right of suffrage?   [Here the Court read from the Constitution of North Carolina, Art. 6, §§ 1 and 2, reading the whole of said sections.]

The Legislature, under the Constitution, has also passed laws f.r the regulation of elections.  [Here the Court read sections 2679, 2680, 2681 and 2682 of *The Code*, to the jury.]

There are several causes or grounds of illegality assigned in respect to the many votes canvassed and investigated by all parties during the trial, viz.: Voters claimed to be under 21—minors; voters claimed to be fraudulent because of double registration; voters claimed to be illegal for improper registration; voters claimed to be illegal, non-residents of the county, or State, or voting in wrong precincts.

## MINORITY VOTES.

It is claimed upon the part of the relator that Bethel Smith, Wallace Doub, and perhaps others, voted for Teague, and were under twenty-one years of age when they voted. It is claimed by defendant that John Belo, and perhaps others, voted for Boyer, and were under twenty-one years. The law requires that the voter shall be twenty-one years old, either before or on the day he votes.  If he arrives at twenty-one on election day, he is permitted to vote.  If the

voter is not then twenty-one, his vote is illegal. You have heard and taken full notes of all this testimony, and it is agreed that I need not state it to you. You have a right to consider, in addition to the other evidence, the family records offered to show the age of any of the voters claimed to be under age; also to inspect said records, and see if any material alteration has been made.

The voter John Belo testifies that he was under age on election day, and voted for Boyer. If you believe his testimony to be true, then his vote is illegal. Then it is for you to say whether he voted for Boyer or not. (Instruction 26.)

After you have canvassed all the testimony offered in respect to the alleged minors, you will determine whether it has been shown by a clear preponderance that any of them, or all of the votes attacked by either party, were illegal on the ground of minority, and if you can ascertain from the testimony how they voted, you will deduct the votes according to the method and instructions heretofore given.

### REGISTRATION.

It is also claimed upon the part of the plaintiff, that Jacob Burke, Golden Brooks, and others, voted for Teague, and were not properly registered; and it is claimed by the defendant that one John Shields, R. P. Kerner, and others, voted for Boyer, and that they were not registered, or not properly registered, or were registered in two precincts, or had no certificates of transfer, and the like. As it has been agreed that I need not state all the testimony, and as you have taken, yourselves, copious notes and paid the best attention to the evidence, I will not go over all these cases attacked on this ground, but will state the law as the Court comprehends it. In addition to actual residence in State and county, the voter must register in the precinct of the county where he resides, before he can legally vote.

Any vote that either the relator Boyer or the defendant Teague has received, unless duly registered, is illegal and should not be counted, but should be deducted.

When a voter is registered in a precinct and desires to move to another in the same county, he must procure a certificate before he can vote in the other precinct, or lawfully register there. If he fails to get this, and registers without it, the vote is illegal, and should not be counted, but should be deducted, if the evidence satisfies you how he voted. (Error and exception No. 28.)

If the voter procures the proper certificate and duly registers thereunder in the precinct to which he removes, then the registrar in the precinct from which he removed must make the proper entry on his book, and erase his name. If such registrar, however, fails to erase the name, after issuing the certificate, without any connivance or complicity of the voter, then such neglect of the registrar of the precinct issuing such certificate would not invalidate the vote, and it would be legal. (Instruction 19) So, also, if a voter properly and correctly gave his name to the registrar, and took the required oath, then if the registrar erroneously registered or misspelled the names, if the identity of the person be the same, that would not invalidate the vote. [Instruction 21.] But if the voter voluntarily and on purpose gave to the registrar any other than his true name, then his vote is illegal and should not be counted, but deducted, as heretofore directed. To illustrate: I will select the case of "Bolin Brooks." It is claimed by the plaintiff that one Golden Brooks voted for Teague and was not registered. The defendant admits that Golden Brooks' name is not registered as Golden Brooks, but defendant says that the name "Bolin Brooks" was intended for Golden Brooks, and that they are one and the same person, and that the registrar made a mistake in registering the name, being misled by similarity of sound. If this be true,

then the vote would be legal and should not be disturbed, or deducted from the Teague column. But if that is not true, and the registrar made no mistake, and Bolin Brooks is another person, or if you believe the said voter wilfully—intentionally—gave in the name Bolin Brooks, another than his own, then the vote is illegal and should be deducted from Teague, as it is admitted that Teague received such vote. [Instruction 21. If there is evidence tending to sustain the supposition of the charge, it should have been recited to the jury.] [Error and Exception No. 29.]

Again, any registration which takes place on the day of election is invalid and illegal, unless the voter becomes of age on that day, or shows the judges of election that for any other reason he has become entitled to register—of which cause the judges of election are to judge. [Instruction 14] It does not appear that any new, general registration has been ordered in this county for many elections past. In becomes necessary, where registration books are worn out, to copy them. If the registrar omits to bring forward a name on the new book, then he may bring it forward on election day, if he has the old book present; for the old book is the registration book where no new, general registration has been ordered. If, in transcribing a book a name is misspelled, or a voter misnamed, the registrar may correct it. To illustrate: It is claimed by defendant Teague that R. P. Kerner voted for Boyer, without legal registration, and offers the registration books. If that be so, then the vote is illegal. But the plaintiff claims that R. P. Kerner was registered as R. B. Kerner; that the registrar made a mistake, without the fault or complicity of the voter, in the middle letter, and that on election day he changed the letter from "B" to "P."; that Kerner was a well-known voter, and, as he testified, had voted at Kernersville every election since the war. If this view of the testimony be true, then the vote is legal and should not be disturbed.

The law requires that a voter shall not only register, but that he shall register in the precinct in which he lives. Section 2676 of *The Code* says, that "no elector shall be entitled to register or vote in any other precinct, or township, than the one in which he is an actual and *bona fide* resident on the day of election."

. It matters not if a man has registered and voted in but one precinct in the county, yet, unless he lives—resides— in that precinct on election day, the vote is illegal, and if, upon a careful examination of the testimony, you find any such cases, they are illegal, and if it be shown for whom they voted, you should deduct them.

But if a voter resided on or so near the precinct, and the precinct line be so uncertain and not well known, that it was doubtful in which precinct the voter lived, and the voter honestly and in good faith, *bona fide* registers and votes in the precinct he in good faith alleges and believes he lives in, and has good reason to believe he is correct, and registers and votes in no other precinct, then such vote is legal, and should not be disturbed or deducted.

To illustrate: It is in evidence and claimed by the defendant that Henry Goings registered and voted in Winston precinct, and it is claimed by defendant that Henry Goings did not reside in said precinct, and that he voted for Boyer. Goings testified that he lived in Winston township, and that he voted for Boyer. But if, as claimed by plaintiff, Henry Goings lived in said township, or so near the line of the precinct that it is fairly doubtful in which precinct he resides, or that the line is doubtful and may include his then residence, and acting under the honest *bona fide* belief that he resided in Winston precinct, Goings registered and voted in this precinct and in no other, then the vote should not be rejected, or declared illegal, but must remain undisturbed. [Instruction 28. Assigned for error.] [Error and exception No. 30.]

Now, as to Cons. Brooks, the registrar must keep his book open from sunrise to sunset in the precinct, as required by law, and there register voters, but if, as is claimed in one of the cases, the registrar receives from the voter a certificate of removal under section 2681 of *The Code*, and administered the proper oath to the voter, outside of the precinct, not having the registration book with him, and when he returns to the precinct puts the name on it and registers him, it is a valid registration. [Instruction 13.]

(The Court also read sections 2676 and 2675 of *The Code.*)

So if a person in jail for misdemeanor (not infamous) and sentenced to imprisonment, escapes and before he is recaptured his term, or sentence, expires and he votes in his own precinct and there registers, the precinct he resided in before he was sentenced, such vote would be valid, if otherwise qualified. But if the voter was a fugitive from justice and hiding from one part of the county to another and voted and registered in the precinct he happened to be in, and not in the precinct of his residence at the time of sentence, then such vote is illegal, and should be deducted from the person's vote for whom it was cast, if that be shown in the testimony. [Instruction 22 ]

Bearing this instruction in mind, you will examine the testimony carefully in regard to Ed. Conrad, *alias* Ed. Jones, and also as to whether he voluntarily registered under a wrong name. [Error and exception No. 31.]

If a voter had previously registered in Winston and his name appears still in said registration books, not erased, and he registered and voted in Salem, without any certificate having been granted, then the vote is illegal and should be deducted, if it should be shown for whom he voted. [Error and exception No. 32.] [Instruction 27.]

But if a certificate was actually granted, and the registrar did not erase the name on the Winston books, but wrote the

word " removed," that does not make the vote invalid. You have the right to consider the parol testimony admitted by the Court, to show by whom the words " removed," in pencil were written.   [Instruction 27, *supra.*]

You will remember this instruction in examining the case of Lorenzo Wise and others. [See evidence.]   Also Clayton Snider, who, it is admitted, voted in Kernersville, without legal registration, for Boyer.

### NON-RESIDENCE.

The most numerous voters disclosed by the testimony, are attacked by the plaintiff, and some are attacked by the defendant, upon the ground of non-residence.

An actual, *bona fide* residence in the State twelve months, and in the county ninety days, entitles a male citizen over twenty-one years, and not coming within the exceptions embraced within section 2679 of *The Code,* heretofore read to you, to vote.   A presumption is then raised that such person has a right to register and vote, and where it is claimed that such a voter voted illegally, because of non-residence, the party attacking such vote must show it by affirmative evidence.   [Instructions 1 and 2.]

If a voter has been duly registered and his vote received by the judges of election and counted in the returns for either Boyer or Teague, as the case may be, if the legality of such vote is contested by Boyer, or by Teague, then the burden is on Boyer, or Teague, whichever attacks it, to satisfy the jury, by affirmative, preponderating testimony or evidence, that such vote was illegal, and also for whom the vote was cast.

The fact alone that a voter goes from the county at once, after he has voted, will not rebut the above-named presumption of legality, but it is a circumstance only that may be

considered, with other evidence, upon the question of residence or domicile. It is not sufficient alone. [Instruction 3.]

The plaintiff claims that William Belies, John Blount, Willis Reed, and many others, voted for Teague and were not actual, *bona fide* residents of the precincts and of this county, on election day, or had not been for ninety days, of the county, or for twelve months, of the State. The same grounds of illegality are claimed by Teague, as to the votes of John Clayton, Joe Golding, E. B. Fulk, W. R. Arthur, and others who, the defendant claims, voted for Boyer. It is unnecessary for the Court to consume time in reading over to you the names of the large number of persons whose votes are attacked by the plaintiff, and some by the defendant, upon this ground of non-residence. You have taken down each name, and the evidence connected with it, on your tablets and *memoranda,* under the direction of the Court, as each case was investigated, and under the agreement of counsel of both plaintiff and defendant, the Court will not state it all over to you again.

In determining the legality of these votes, it becomes necessary to determine what is such residence as the Constitution requires. What is meant by the words "shall have resided?" The use of this word residence is synonymous with domicile. It does not mean a temporary place of abode. It means the home of the voter, the actual, *bona fide* home of the voter, to which he expects and intends to return when he goes away from it, either on pleasure or business. This *animus revertendi,* or intention of returning, is very material. Residence or domicile is very essentially a question of intention, and entirely governed by the intent of a person's mind. This intention is not only manifested by words and statements of the voter, but also by his acts. The acts and doings of a person are oftentimes very valuable evidence of such person's intentions and his mental determinations; for a person may say one thing and do another. A great law-

writer, endorsed by our Supreme Court, has declared that a person's residence or domicile, is "the place where such person lives or has his home, that is, where he has his true, fixed, permanent home and principal establishment. and to which, whenever he is absent, he has the intention of returning."

This law does not intend to deprive actual, *bona fide* citizens of North Carolina of their right to vote, because they have left the State and resided temporarily beyond its limits, with a constant purpose to return to their homes in the county of their residence, and to return to such home when their business, which calls them away, has been completed.

This clause requiring *residence* was more especially designed to meet the case of persons coming into the county, or the State, who are not allowed to vote, or exercise political rights, until they have for the said periods of time been in the State or county ; and not then, unless they have, before exercising their rights, made it their actual *bona fide* residence or domicile for the periods prescribed by the Constitution in respect to the State and in respect to the county. [See exceptions 20, 23 and 34.]

The test of domicile is the intent of the person—in this case, of the voters. The intent to make this county a home, or domicile, must concur with the acts of the person. This intent is established, not solely by the declarations of the alleged voter on the witness stand, but also by all the attendant circumstances offered in evidence.

Temporary employment in this county, summer after summer, with a home retained elsewhere, is not a residence within the contemplation of the law, and does not confer the right to vote.

The provisions of section 2680 of *The Code* determine, to a certain extent, the residence of a married man, as well as a single man. It enacts that the residence of a married

man shall be where his family resides, and that of a single man where he boards and sleeps; and where a single man boards in one ward or precinct and sleeps in another, then his residence shall be in the ward or precinct in which he sleeps, and he shall not register or vote in any other ward or precinct; and no elector or person shall be allowed to register in any ward or precinct, to which he shall have removed, for the mere purpose of being a voter therein, nor unless his *residence* therein is actual and *bona fide.*

A man's family may consist of his wife alone, or, if he has children, of his wife and children; or it may consist of himself and his children, and others residing with him, whom he regards as his family. If a man's wife abandons him, or separates from him without his fault, it does not affect the man's domicile. A man has the legal right to change his domicile, and if his wife refuses to go with him to the place where he decides to reside as his home, his right to vote in the new domicile cannot be thereby affected. [Instructions 10, 11, 12.]

It is claimed by the plaintiff that the testimony offered by him shows that very many of the voters whose cases have been investigated in this trial voted for Teague for Sheriff, and were not actual *bona fide* residents of this county at the time of voting.

The plaintiff contends that the testimony shows that these voters came here from Danville, Reidsville, Leaksville, and other places and towns, for a temporary purpose—to work for a certain season during the time when tobacco is manufactured here; that they leave their families behind them, and after the season is over return to their homes; and that the evidence discloses that their *bona fide* homes are the places to which they return, and not this town or county. The plaintiff offers the declarations of these voters (confined by the Court to such declarations as were made by the voter at or before the time of voting). He says these declarations

show that the voters themselves regarded their homes as at the places where they came from, and not in this county.

The defendant has replied to this testimony and put on the stand many of the voters themselves, and introduced other witnesses and testimony, which the defendant contends rebuts the plaintiff's evidence and shows that these voters regarded this county as their home, and moved here with the *bona fide* purpose of making it their home, or after they moved here, then determined to reside here as a home, and that when they go away, it is not to return to their homes, but only on temporary business or pleasure.

The defendant also offers testimony which he says proves that certain voters, whose names you have, voted for Boyer, and who were non-residents of this county at the time of voting. To this testimony the plaintiff replied, undertaking, as he says, to show that these votes cast for him and attacked by defendant were legal, and that the voters were *bona fide* residents of this county when their votes were cast, and had been, the proper length of time, as required by law.

Now apply the principles of law laid down to you by the Court to all this mass of testimony, and determine if any of such votes were illegal, and for whom the vote was cast. Remember always, that where a voter has registered and voted and passed the judges, and his vote deposited in the box, it makes a *prima facie* right to vote, and whoever attacks that vote and alleges its illegality must prove it by satisfactory testimony, and by a preponderance of evidence, and must further show for whom the vote was cast before you can deduct it. If the vote is thus shown to be illegal and for whom it was cast, you should deduct it from the votes, or column of votes, of him for whom it was cast.

It is admitted by the plaintiff that he has not offered evidence sufficient to show the illegality of the following votes, or as to whom they voted, viz., Paul Harris, Ches. Howell, John Hill, F. E. Setzer, George Jamieson, Wallace Moore,

William (or Jack) Foy, James Hanesberry and Peter Foy. You will, therefore, not consider those voters, whose votes were cast at last election; and you will not deduct them from either plaintiff or defendant.

The Court at this point gave the instruction embodied in the opinion, which was the subject of the 33d exception.

After the first argument in the cause, the Court granted a writ of *certiorari*, the return to which is appended.

You will now take the case, and, after a careful examination of the testimony, and taking the law as expounded by the Court, you will write your answer to each of the two issues submitted to you by the Court.

If you are satisfied, by a clear preponderance of the evidence, that Boyer received a majority of the *legal* votes cast for Sheriff at the election in 1888, you will answer the first issue Yes, and the second issue No.

If you are not so satisfied, then you should answer the first issue No, and the second issue Yes.

The Court has received from the defendant thirty-two prayers, or requests, for specific instructions, and the Court has charged upon all except such as were rendered unnecessary by admissions of plaintiff's counsel, on the argument, and except the ninth

The Court is requested by the defendant to charge that if a voter has lived twelve months in this State and for ninety days in this county, and does not intend to become a citizen of this county until the day he registers, his vote, if cast, is legal.

The Court declines to so charge you, but does charge you such interpretation of the law by the defendant is unwarranted and against the express words of the Constitution. Living in the State for twelve months and in the county for ninety days is not sufficient to acquire the right to vote. The person must have entered into the State and taken it as his residence, home or domicile for twelve months before he

can vote. And also, if he is a resident of this State and moves to another county, the law requires actual residence and domicile in such county for ninety days. Mere living, or being there, will not do. The voter must be there the Constitutional period of time, with the intention to make his home or residence for such period. To illustrate: If a person comes here from Virginia, where he has heretofore resided, and desires to acquire political privileges in North Carolina, and is otherwise qualified, he must have relinquished and given up his Virginia domicile and have resided in this State, in some part of it, for twelve months before he votes, and three months of this twelve, his actual residence, home or domicile, must have been in the county prior to the time he votes, or offers to vote, in such county. [Instruction 9.] [Error and exception No. 34.]

The intention to acquire a domicile in the State and county, and the act of acquiring such domicile, must concur and exist for the Constitutional period of time before the right to vote is acquired. A man must vote where his actual home or domicile is. As Mr. Payne, in his work on elections, says: "A person cannot have a domicile for political purposes in one place, and an actual home in another place."

The defendant proposed the following issues:

1. Were any illegal votes cast for Milton E. Teague, for Sheriff; if so, how many, and by whom were they cast?

2. Were any illegal votes cast for John Boyer, for Sheriff; if so, how many, and by whom were they cast?

His Honor declined to submit defendant's proposed issues. The defendant excepted. [Error and exception No. 17.]

His Honor thereupon submitted the following issues to the jury:

1. Was the relator John Boyer duly and legally elected Sheriff of Forsyth County, at the election held in November, 1888?

2. Was the defendant Teague duly and legally elected Sheriff of Forsyth County, at the election held in November, 1888 ? [The defendant maintains that these issues are insufficient and assigns the same for error.] [Error and exception, No. 18.]

The return to writ of *certiorari*, ordering that the evidence in relation to the qualification of certain voters be sent up, is as follows :

"On receipt of the *certiorari*, I fixed a time and place, and notified both parties that I was informed by counsel that the only evidence desired by your Honors is such as was adduced on said trial in reference to Thomas Hanes, Frank Fowler, Thomas Lee, George Foy, N. L. Young, Ed. Davis, Creed Hairston, James Brown, Charles Yokely, Bob Moore and William Holmes. I hereby certify that the evidence admitted on the said trial as to said votes was substantially as follows: The poll books and all the registration books introduced by the plaintiff showing the names of the voters who voted at the several precincts in Forsyth County at the election in November, 1888; said poll books showed that Thomas Hanes voted in Winston, number 1191.

Noah Kimmel testified that he lived in Davidson County at the time of the election, and that Thomas Hanes was a young colored man who lived with his father, Solomon Hanes, near witness, in Davidson County. About Christmas, 1887, he got into a difficulty and went to Charlotte, and on the 4th of August, 1888, witness met Thomas Hanes and carried him home in his wagon; that Hanes then lived at his father's until about September 29th, 1888, working on witness' farm, then he left his father's in Davidson County and went off.

J. C. Bessent testified that at the November election he acted as challenger at Winston box for the plaintiff Boyer, and generally for the Democratic ticket, and H. R. Starbuck acted as Republican challenger. Witness kept up closely

with all the voters, and challenged only for his side. Thomas Hanes, a young colored man, offered to vote early in the morning, and was challenged by witness. He was a strang man, and did not live in Winston. He returned, and was permitted to vote. Witness cannot swear that he saw every name on his ticket, nor does he know that every colored voter, with a few exceptions well known to witness (none of which exceptions mentioned by the witness are embraced in the names in this statement), got their tickets from a certain table where Teague tickets only were handed out, and from Teague's recognized agents, and came down the line within the ropes and voted.

Frank Johnson, witness for the defendant for other purposes, upon cross-examination stated that he handed out Teague tickets all day; that Teague had a table near the head of the line with Teague tickets on it; that colored voters got their tickets, fell into line about three deep and passed down the ropes to the window where the voting was done. Several other witnesses, upon cross-examination by the plaintiff, testified that they had not seen Thomas Hanes, Frank Fowler, Ed. Davis, Thomas Lee or Bob Moore in Winston since the election.

As to Frank Fowler, poll books show that he voted in Winston, number 102.

J. C. Bessent testified that he saw him vote for Teague; that he, Bessent, was town tax collector in Winston, and had been for many years; that he was well acquainted with the people, white and colored; that he know nearly all the colored people in Winston; made it a special business to keep up with them in order to save taxes. He knew that Frank Fowler voted at the election for Teague. Never saw him in Winston until a few months before the election, and that he was never there before. Never gave in or paid taxes that year in Winston; thinks he came from Virginia. The day following the election, witness saw him buy a railroad ticket

to Clarksville, Va.   He left that evening on the train, and has never been in Winston since.

As to Thomas Lee, poll-books show that he voted in Winston, number 577.

J. C. Bessent testified that he saw him vote for Teague; that he knew him; that he was a young looking negro.

John G. Young, Registrar for Winston precinct, testified that Thomas Lee came to him to register; that he was a young looking negro, and, on account of his very youthful appearance, he examined him as to his age.   Thomas Lee told witness that he was born in October, 1868; witness told him he was not twenty-one, and refused to register him. Afterwards a party unknown to witness brought him back, and stated, on oath, that he was twenty-one, and witness registered him.   His appearance indicated that he was not twenty-one.

As to George Foy, poll-books show that he voted in Winston, number 1046.

A. Stewart testified that he knew George Foy in Rockingham County.   Shortly before the election in 1888, witness met George Foy in Winston, and asked him where he lived. Foy said he lived in Rockingham County on the Webster place; that his home was with his father in said county; that he had been working in the factory; that the factory had stopped, but that he was not going home until after the election.   After the election he did go to Rockingham County.

George Foy was examined as a witness, and testified that he voted for Teague; that he came from Rockingham County in the summer, to work in the factory, and always went back when the factory stopped work.   On cross-examination by the defendant, witness stated: "I consider Winston my home and go to Rockingham to see my parents."

As to N. L. Young, the poll-books show that he voted in Winston, No. 584.   Being called by plaintiff, Young stated

106—39

that he came to Winston in the summer of 1887, on a visit; staid a short time and left; that he was raised in South Carolina, and came to Charlotte, N. C., in January, 1885; that he " pastored around," preaching in Charlotte, Statesville and other places, having no settled home; that in January, 1887, his wife died in Chester, S. C.; at Christmas, 1887, he came to Winston to live; that he remained here, except once in 1888, when he returned to Chester, S. C., to see one of his children, who was sick; that he voted for Teague.

Giles Bason, colored, was introduced as a witness by defendant for some other purpose, and, on cross-examination by plaintiff, stated that he had lived in Winston a long time, and was well acquainted with the colored people in it; that N. L. Young did not come to Winston until the summer of 1888, after electioneering had commenced; that he had not seen him in Winston until about that time, when he first saw him in the church as a preacher.

As to Ed. Davis, the poll-books show that he voted in Winston, No. 219.

Green Williams, Chief of Police in Danville, Virginia, testified by deposition that he knew Ed. Davis, a colored man; that up to about the first of 1888, he resided in Danville, Virginia, and was often in jail there. That between Christmas, 1887, and the Spring of 1888 (witness not being certain as to the exact day), he left Danville; he returned the following fall or winter of 1888, and stated in the presence of witness that he had been over to Winston. Said deposition is sent as part of this statement. No objection was made to the reading the part of said deposition above quoted.

Frank Johnson, upon cross examination further stated, without objection, in addition to what is set forth elsewhere, that the colored voters got to the polls as soon as they were opened, and they got their tickets from the table where the

Teague tickets were distributed, and filled the ropes back about three deep, crossed close together, for a distance of about one hundred feet, nearly to the outside gate of the court-house square.   The registration showed that Ed. Davis was registered as " Ed. Davis, Colored."

The poll-book of Abbott's Creek township showed that Charles Yokely voted, No. 100.   William Clinard testified that he saw Yokely vote for Teague at the election in November, 1888.   Landon Charles testified that Charles Yokely's father lived in Davidson County; that in the Spring of 1887, Charles Yokely rented land from witness, in Forsyth County; that he came to his home to make a crop, and, while there, married in the summer of 1888.   Charles Yokely and his wife moved back to Davidson County and lived with his father; that Yokely did not return to Forsyth County until the latter part of October, 1888, when he rented land for another crop.

Randall Bodenhammer testified that in October, 1888, he rented Charles Yokely a piece of land; Yokely then lived in Davidson County; he rented from me in Forsyth County on October 2d, 1888, and moved over from Davidson between the 10th and 20th; he told me before the election that he had a great mind to register in Forsyth County.

As to Creed Hairston, the Salem poll-books show that he voted, No. 237.

William Reynolds testified that he knew Creed Hairston; he works generally from April till November in Reynolds' factory; he lives in Stokes County and has a house in Walnut Cove, and goes home every winter.

Creed Hairston testified: "I live in Walnut Cove, Stokes County, and have for several years; I came from there this morning; had a house in 1888; sold it this year after my mother died; I work here in summer and board in Salem with my brother.   I was raised in Stokes County, and always made that my home."   On cross-examination by defend-

ant, he said that at the time he registered he considered Salem his home, and boarded with a relative in Salem at that time.

As to James Brown, Dr. Kerner testified that he saw James Brown vote at Kernersville precinct for Teague. Witness had been a practicing physician in that township for forty years; never saw James Brown in the precinct until he applied to vote, and has never seen him since the election, and he challenged him on the ground of non-residence. Brown stated that he came from Virginia; that his wife was there, but that he had had a letter to show she was dead; he went away and brought a letter postmarked Reidsville, N. C.; and the letter was read at the polls and contained a statement that his wife was dead and some one else in jail, and he could return home.

Frank Davis was afterwards called by the defendant and testified that Brown had lived in Kernersville four years; that he worked on the railroad, and since the election was off in the eastern part of this State working on the railroad. On cross-examination witness was unable to state where, in Kernersville, Brown had lived during the four years.

As to Bob Moore, poll-books showed that he voted in Winston, No. 819.

J. C. Bessent testified that Bob Moore was a crippled negro; that just before the election Moore told him that he lived in Stokes County, and paid his taxes there; he had not been seen in Winston since the election. Witness saw him vote for Teague.

John G. Young testified that Bob Moore told him before the election that his home was in Stokes County.

As to William Holmes, Thomas B. Roberts testified that he knew William Holmes, colored; saw him vote in Louisville township, in the election of 1888, for Teague; that in the Spring of 1888, Holmes staid a week or two in the township, but went away to work on the railroad. A week

or two before the election he first moved his family into the township; they remained until after the election and lived half a mile from witness. Shortly after the election they all left, and witness has not seen them since. A few days before the election, witness asked Holmes if he was going to the speaking that day. Holmes said "No;" that he did not care to go, as he could not vote here; that he had to go to Salisbury, where his home was, to vote. Witness further testified that three or four years before the election, Holmes was married in Louisville township, and moved his wife to Salisbury.

Wherever the words "voted for Teague" are used, the meaning is, that the vote was cast for the defendant at the election in November, 1888, for Sheriff of Forsyth County.

The above is the testimony as contended for and argued to the jury by plaintiff. The defendant denied that the witnesses had so testified. Counsel disagreeing as to the statement of the witnesses, the Court declined the defendant's 23d prayer for instruction, so far as it relates to the voters named in this statement, and left it to the jury to say how the matter was as per written charge. The presiding Judge declares the testimony was substantially as herein set forth.

*Messrs. C. B. Watson, J. C. Buxton* and *R. B. Glenn,* for plaintiff. .

*Messrs. W. S. Ball* and *L. M. Scott* for defendant.

AVERY, J.—after stating the facts: The motion made at the February Term, 1889, to compel the plaintiff to file a bill of particulars, rested upon the ground that the second paragraph of the original complaint was not sufficiently definite. The section referred to was as follows:

"2. That the relator John Boyer at said election, as he is informed and believes, received a majority of all the legal votes cast, and was duly elected to fill the said office of Sheriff of said county for the said term of two years, but notwithstanding the relator received said majority of the lawful votes cast and was duly elected to said office, the defendant M. E. Teague, against the protest of the relator and against his consent, has been unlawfully inducted into said office, and now unlawfully usurps the office to which the relator was elected and is wrongfully and unlawfully holding the same and receiving the profits and emoluments thereof, which rightfully belong to the relator."

The plaintiff thereupon amended his complaint by substituting in place of said paragraph the following:

"2. That the relator John Boyer, at said election, as he is informed and believes, received a majority of all the legal votes cast, and was duly elected to the office of Sheriff of Forsyth County for the said term of two years, but notwithstanding the relator received a majority of the votes cast by legally qualified voters of said county, a large number of votes were cast for the defendant at the various precincts in said county by persons who were not qualified voters in said respective voting precincts and townships, and were received and counted by the poll-holders. Some of said votes were cast by persons who were not residents of the townships and voting precincts wherein they voted; others by persons who were non-residents of the State; others by minors; others by persons disqualified by crime under the laws of the State; others who were not legally registered; a large majority of which illegal and fraudulent votes were cast in the Winston township, and those townships adjacent thereto. That the number of votes thus received and counted against the relator, as the relator is informed and believes, greatly outnumber the majority

by which the defendant was declared by the canvassing board to have been elected."

After the amended complaint had been filed, his Honor, Judge Philips, presiding at that term, in the exercise of his discretion, denied the motion requiring the plaintiff to file a bill of particulars. The refusal of the Court to compel the filing of a more specific statement of the grounds of relief asked by the relator, gives rise to the first exception, and the second, third and seventh involve substantially the same point.

At October Term, 1889, before Hon. John A. Gilmer, Judge presiding, the defendant submitted the following motion, in writing:

"The defendant moves for specifications to be furnished by the plaintiff, to include the following points:

"1. The names of alleged illegal voters relied upon by plaintiff to reduce the defendant's majority.

"2. The precincts in which such alleged illegal votes were cast.

"3. The specific act relied on by the plaintiff in each instance."

Thereupon, his Honor made the following order:

"That the parties furnish to each other bills of particulars, giving the following notices:

"1. The number of illegal votes cast, and for whom cast.

"2. The grounds of illegality of each respective class of illegal votes.

"3. When and where polled."

The defendant excepted to the foregoing order because it did not furnish the full relief demanded. [Error and Exception No. 2.]

On the 25th day of November, 1889, the defendant served upon the plaintiff the following notice of motion:

"*To the plaintiff:* Take notice, that at the next special or regular term of said Superior Court to be held in said county,

the defendant will move the Court to require the plaintiff to further amend the complaint, as follows:

"1. To allege, specifically and particularly, the ground of complaint against the validity of the election mentioned in the complaint, and against each voter.

"2. To state, particularly, the names and number of persons who, it is alleged, have been counted as voters, and who ought not to have been so counted.

"3. The specific act relied on by the plaintiff in each case, and the name of each voter to be attached, and the precinct in which he voted.

"Such motion will be made unless the plaintiff so amends the complaint and files a copy in the office of the Clerk of said Court, or a copy thereof be served upon the defendant, within twenty days after the service of this notice; or, unless the information required by such amendments be furnished to the defendant, in writing, within said twenty days."

A special term of the Superior Court of Forsyth County was appointed by Hon. Daniel G. Fowle, Governor, to be held on the 6th day of January, 1890.

This case was called on Wednesday, the 8th day of January, during the said special term; whereupon, the defendant, pursuant to the last-named notice, moved the Court that the plaintiff be required to amend the complaint in accordance with the demand in said notice contained.

The motion of defendant was denied in the following terms:

"The Court having declined to grant defendant's motion for an order to amend the complaint, the defendant prayed an appeal and asked that the Court stay the trial until said appeal be heard. Declined by the Court. Exception by defendant." [Error and exception.]

The general provision of *The Code* (§ 259) is, that " the Court may, in all cases, order a bill of particulars of the

claim of either party to be furnished." When a complaint contains a statement of facts that constitutes a cause of action, according to the establi-hed principles of law, the responsibility rests upon the trial judge, in the exercise of a sound discretion, to determine whether more specific and detailed statements of facts, when demanded by either of the parties to the action, should be required to prevent surprise or prohibited to avoid confusion and prolixity in the trial. *Election Cases*, 65 Penn. State Rep., p. 35; *Tilton v. Beecher*, 59 N. Y., 183. When, therefore, the relator alleged in his complaint that a sufficient number of illegal votes had been cast for the incumbent in Forsyth County, and counted for him in the computation upon which his *prima facie* right to the office depended, to change the result if the illegal voters had been denied the privil·ge of exercising the elective franchise, his statement, if proven, would have established his right to the judgment demanded. *Yearby v. Snow*, 107 Penn. St., 183; *State v. Mason*, 14 La. Ann., 505; *Halstead v. Roden*, 27 W. Va., 806. The corrective power of the presiding Judge to set aside a verdict for surprise, would have given the defendant additional security if it had actually appeared that he was misled in making his preparation to meet the testimony offered for the relator. We think that when Judge Gilmer required the relator to give the aggregate number of illegal votes alleged to have been cast for the defendant, the grounds upon which the charges of illegality were based as to each class, and when the votes were polled, the defendant could not claim, as of right, a fuller and more definite specification of what the relator expected to prove. Brightley's L. C. E, p. 334; *Wheat v. Roysdale*, 27 Indiana, 201; *ibid*, 162.

In trying the title to an office which involves the preservation of the purity of elections and the protection of the popular right of suffrage, public policy and intrinsic justice alike forbid that a Judge, vested with important discretion-

ary powers, should exercise them in such manner as to permit so grave a question to degenerate into a technical contest as to the correct spelling of the name of an obscure tramp, with a convenient supply of *alias* surnames, or to allow an incumbent to enjoy the fruits of his fraudulent practices, because a relator could not induce an unwilling witness to disclose the true name of an individual who had been one of the instruments used in its perpetration, until the information could be extracted from him on his examination under oath. It is sufficient, where there are no restrictive statutes changing the general principle, that the contestant for an office should notify the contestee in his complaint of the nature of the objections made to the validity of the election, and it then rests with the latter to show the Court, on a motion to require more definite information, that he cannot prepare his defence without incurring unnec essary expense, or at all, if certain specifications of the contestant's ground should not be made. *Shields* v. *Howard*, 16 Ohio St., 184; *Griffin* v. *Wall*, 32 Ala., 150; *Hadley* v. *Gutridge.* 58 Indiana, 302; *O'Gormon* v. *Richter*, 31 Minn., 25. We fail to find the rigid rule, that a contestant of an election in a notice on a pleading should be required to give the contestee the name of every alleged illegal voter, as to whom he proposes to offer proof, approved in any of the States, and it seems now to be enforced only in obedience to the letter of a statute requiring it in some States, as in Missouri. *Kreitz* v. *Behnesmeyer*, 25 Ill., 141. The question involved in the decision of *Rigsbee* v. *Durham*, 99 N. C., 341, was very different from that presented in this case. There the plaintiff alleged in general terms that a majority of the qualified voters did not vote for the school, and stated as a reason that the defendant Commissioners had improperly stricken from the registration books the names of one hundred and eighty voters, and if those names were restored the number cast in favor of the school would not constitute a majority of the

whole registration list. Evidence was heard upon an issue framed as to the legality of striking off said names (see p. 345), and the plaintiff submitted to judgment of nonsuit, because the Court held that the testimony offered did not tend to show that any persons whose names were stricken off were legal voters. The judgment below was sustained in this Court. It appears, therefore, that the Judge in that case allowed an issue to be submitted upon a much more vague and indefinite statement than we have in the case before us.

The test laid down in *Skerritt's* case (2 Pars. Pa., 509) was, whether the facts set forth are such that, if true, it would be the duty of the Court to vacate the election or declare another person than the one returned to have been duly elected. McCrary on Elec., § 402. But it seems that the rule was relaxed by the Supreme Court of that State in later cases. *Gibbons* v. *Shepard, supra.*

The Code (§§ 1722 to 1730, both inclusive) prescribes the mode of selecting and drawing and the qualifications of jurors. Special provision is made in section 1731 for the drawing of jurors for special terms by the Commissioners. But the Sheriff is not required to act in any case except where the Commissioners neglect to draw the jury, and then the duty devolves (under § 1732) upon him, the clerk of the Board of Commissioners and two Justices of the Peace. A special term of the Court had been called when this case had been at issue for several terms, and perhaps with the trial of it particularly in view. We find the Sheriff officiously taking charge of the drawing for that term, and receiving the scrolls as they were drawn by a boy, calling the name without submitting more than two or three to the inspection of any other person, and passing them into a locked box. It was the duty of the Commissioners to supervise the taking out of the scrolls and depositing them in the other box. While his Honor did not find, and had no means of knowing, that

there was actual fraud on the part of the defendant, it is plain that, by his improper interference with the duties of others, he had the opportunity and the temptation to perpetrate a fraud upon the relator with but the remotest chance of detection. The fact that one name that ought to have been in box No. 2 was again found in No. 1 strongly suggests some irregularity or tampering with the names by some one. Challenges to the array are exceptions to the whole panel, and are generally founded on a charge of partiality or some default of the Sheriff or other officer who summoned them. *State* v. *Murph,* Winston (N. C), 129; 3 Blackst. Com., 359; Abbot's Law Dictionary (challenge). The action of his Honor was founded upon the idea, not that there was, but that there might have been, fraud on the part of the defendant, and that the opportunity was afforded him by officiously intermeddling, when a man who had a proper sense of propriety and wished to avoid the appearance of evil would have refused, if requested, to take any part in the drawing.

When the array had been set aside, the defendant moved the Court to have another jury drawn, under the provisions of section 1732, but, so soon as they were drawn, challenged the array, and the Court set it aside also on his motion. The Judge then appointed one S., under the provisions of chapter 441, Laws of 1889, which authorizes the appointment of some suitable person by the Judge to summon a jury from the by-standers when the Sheriff is a party or has an indirect interest in the action to be tried. The Legislature has thus given its sanction to the idea that seemed to have operated upon the Judge's mind in first discharging the whole panel.

But it is insisted that the summoning of jurors *de circumstantibus* is a mode of supplementing a jury insufficient in numbers to discharge the businesss, but that a Court has no power, when all summoned as regular jurors under any

other provision of the law have been discharged, to create
the whole panel by an order for a special venire, unless some
statute authorizes that course to be pursued. The direct
provisions of the various statutes had been resorted to in
vain to procure a jury of good and lawful men to try this
cause. Blackstone, in his Commentaries (Vol. 3, p. 364),
says: "If, by means of challenges or other cause, a sufficient
number of unexceptionable jurors doth not appear at the
trial, either party may pray a tales. A tales is a supply
of such men as are summoned on the first panel in order to
make up the deficiency." This rule was founded upon a
construction given by the Courts to the old English statutes
in reference to a tales *de circumstantibus.* But our *Code,* af·er
giving in detail the methods of drawing jurors, provides, in
section 1733, in order "that there may not be a defect of
jurors, the sheriff shall, by order of the Court, summon from
day to day of the by-standers, other jurors, being freeholders
within the county where the Court is held, to serve on the
petit jury, and on any day the Court may discharge
those who have served the preceding day," &c. If there is
not an inherent power in a Court, under the common law,
to provide for the summoning of a venire in order to avoid
a failure to administer the law where the officers, by their
dereliction of duty, have failed to select a jury, or by their
conduct have made it apparent that there was, or possibly
that there might have been, fraud in the selection of the
panel returned, the section of *The Code* last cited (1733)
was evidently intended to give the Court, by necessary
implication, the power to meet any such emergency, by
requiring the Sheriff (for whom the act of 1889 allows the
Court, in cases like this, to appoint a substitute) to summon
freeholders of the county. Perhaps a different rule might
prevail were a judge, through mere caprice, or upon insuf-
ficient grounds, to discharge the whole panel before ordering
the summoning of tales jurors. Thompson & Merriam on

Juries, § 81. But here the first panel was set aside for reasons that we hold sufficient, and the second, on motion of the party who seeks to take advantage of the allowance of his own motion, to adjourn the Court and hold the office of which he is the incumbent. The suggestion that the act of 1889 was passed after this action was brought, and that it would be unconstitutional to resort to its provisions in procuring a jury in the trial of pre-existing suits is not supported by reason or authority. The Legislature have the right to alter the remedy, provided it is not destroyed or impaired. The evident object in passing the act of 1889 was to prevent possible fraud, on the part of a Sheriff, in the selection of jurors to try an action to which he is a party, or in which he has an interest.

The qualification of an elector under our Constitution depends upon the questions whether he was born in the United States or has been naturalized, is twenty-one years old, has resided in the State twelve months, and in the county in which he proposes to vote ninety days, and shall have registered in the township or voting precinct in which he proposes to vote, according to law. Constitution, Art. 6, sections 1 and 2.

The person must have come into the State a year before the election, or have been domiciled within it for twelve months after forming the purpose to remain, in order to constitute him a resident, and the same intent must be concurrent with the actual occupation of a domicile in the county in order to entitle him to the rights of an elector within its limits. The qualification of one who has a domicile in the State, except where the law makes certain acts conclusive evidence in determining where it is, must often depend solely upon the intent which is known only to him, or upon his age, which often cannot be actually ascertained except from family records, not accessible to others, or from his statements. The lives and fortunes of men are con-

stantly made to depend upon their declarations, used as evidence of the existence of malice or of fraud, as motives controlling their conduct, and we see no sufficient reason why the declarations of a person and such circumstantial evidence as tends to show his intent in so far as it is material in determining whether he is a qualified voter, should not be heard in the adjudication of his rights as an elector, or in passing upon an issue which involves the question whether he was a qualified voter. The declarations of a voter as to his qualifications, generally, if made at the time of voting, are competent as a part of the *res gestæ*, and if not contemporaneous, but made previously, are admissible, if such declarations are in disparagement of his right as an elector, because they are against his interest, and he is considered as represented by the party for whom his suffrage was cast. Taylor, in his Work on Evidence (vol. 1, sec. 686), says: "On this ground (because the declarant, though not a party, is interested in the subject-matter of the suit) it has been repeatedly held on the trial of election petitions that the declarations of voters against their own votes, whether made before or after the votes were given, and even though invalidating their own votes on the ground of their having received bribes, are admissible in evidence, for in a scrutiny each case is considered a separate cause, in which the supporter of the vote under discussion and the voter are parties on one side, and the opposers of the vote are the parties on the other."

The rule as stated generally and, as we think, correctly, by the Courts in this country, is, that after first showing that a person voted against a contestant, or offering testimony tending to show that he so voted, he is considered a party in interest as against the latter, and any declaration showing his want of qualification to vote is admissible, like those of a party made against his own interest. But it is held by most of the Courts in the United States that such declara-

tions, when made some time after the vote has been cast, are not competent. *Beardstown* v. *Virginia*, 76 Ill., 34; *ibid*, 81 Ill., 541; Abbot's Trial Ev., p. 750; *People* v. *Pearse*, 27 N. Y., 45; Am. Dec. p. 268 *et seq.*, notes; Paine on Elec., § 773; *French* v. *Lighty*, 9 Ind., 478.

The eighth exception shows that the Judge below was guided by the principles we have announced. It was as follows:

"The plaintiff proved by a witness that Bethel Smith voted for the defendant at the election in November, 1888. Plaintiff then proved the declarations and acts of Bethel Smith, tending to prove that his vote was illegal, and that he was not a duly qualified voter, such acts and declarations being made at and before the time of voting. Objected to by the defendant. The Court overruled the objection and stated that it would admit the declarations of an alleged illegal voter made at the time, or before voting, but that the plain-tiff must prove, by other legal evidence, that such voter voted for the defendant, and the Court would exclude any declarations offered by the plaintiff made by a voter after the election. Exception by defendant. [Error and exception No. 7.]

The ninth and tenth exceptions are substantially the same as the eighth. Counsel, in discussing these exceptions, frequently referred to the competency of declarations as to intent, bearing upon the question of domicile. Declarations accompanying and explaining any act tending to throw light upon the question where the domicile of the person making it was, and what his intent as to residence at a particular time when it was drawn in question, are admissible as explanatory of the act, and it is generally conceded now, that where such declarations come within the rule already stated, as invalidating the right of an elector who makes them, to vote, they are admissible, even if not contemporaneous with, and explanatory of, the act of voting, but made previously.

2 Whar. Ev., § 938; Jacob's Law of Domicile, § 451; 1 Green-
leaf Ev., § 108 and notes (a) and (c); 1 Wharton's Ev., §§ 258
to 268; Brightly Elec., p. 113; Abbott's L. Ev., p. 107, and
notes.

An honest elector who has observed the law enjoys the
privilege, which is entirely a personal one, of refusing to
disclose, even under oath as a witness, for whom he voted.
This rule grows out of the secret ballot system, generally
adopted in this country for the protection of the voter and
the preservation of purity and independence in the exercise
of this most important franchise. If an illegal voter can
claim the privilege at all, it is because he finds shelter under
the very different principle that he cannot be compelled to
criminate himself. As between contestants for office, how-
ever, the testimony of the elector, if pertinent and relevant,
is always admissible. Neither contestant nor contestee are
called upon to contend for the rights of a witness who does
not demand protection, and, if compelled to testify against
his will, it does not follow that testimony, competent with-
out objection on his part, should not go to the jury for what
it may be worth. *People* v. *Pearse, supra;* McCrary on Elec.,
457, 458, 459. It does not appear, in fact, that the witness
Winchester made any objection whatever to answering the
question. We are not to be understood as disapproving of
the ruling of the Judge upon the abstract question. It
seems there are good reasons for sustaining the rule that
the Judge who tries a case may, in the exercise of his dis-
cretion, determine certainly, as between contestant and con-
testee, if there is any evidence at all, how much testimony,
tending to show the illegality of a particular vote, is suffi-
cient as a foundation for compelling the voter to tell for
whom he voted. The Judge passes upon the preliminary evi-
dence to show loss of papers or establish a conspiracy before
admitting proof of contents in the one case, and declara-

106—40

tions of alleged conspirators in the other, and his decision is not reviewable in the appellate Court.

Where it does not appear from the direct testimony of the voter, or any other person, for what candidate he voted, there is no reason why circumstantial evidence should not be held competent as tending to establish the fact, leaving the Court to pass upon its sufficiency at any stage of its development as a foundation for compelling him to testify, and allowing the jury to determine, upon all the evidence, in whose column of voters he should be counted. The fact that a certain person was engaged in handing out tickets for the defendant Teague, and for no other person, and that he gave tickets to one Wicker and "voted him," is competent, and tends to show for whom Wicker voted. The Courts would not be capable of passing upon the relevancy of such circumstantial testimony, when offered, if they did not take notice of the not very commendable practice of supplying voters with tickets and leading them to the polls, which the witness described as "voting him." The guidance of reason and common sense must be ignored, as a basis of the rules of evidence, if Lowery's conduct were not held to be circumstantial testimony tending to show how Wicker voted. McCrary on Elec., § 458; Paine on Elec., § 768; 6 Am. and Eng. Ency. of Law, p. 430, and notes.

It was competent to show that a man who voted in Bethania township in Forsyth County, under the name of Ed. Conrad, had been a resident of Winston in the spring before the election, had been indicted under the name of Ed. Jones, and had been convicted and sentenced to imprisonment for ninety days; that he had escaped jail, and had not lived in Bethania township for two or three years before the election, but had lived in Winston township for that length of time.

The identity of the man being established, the record of his indictment and conviction was admissible, not to disqualify him for crime, but to prove the fraudulent voting.

We think that a witness is competent to testify to a fact of the truth of which he says that he feels "reasonably certain." That was the best impression of an eye-witness, and it was not necessary that his recollection should be so vivid as to exclude all doubt. 1 Greenleaf Ev., 440.

*Exceptions 15 and 16.*—Exceptions numbered fifteen and sixteen are stated in the record as follows:

The defendant next proceeded to prove by Robert Hall and John Watkins, and also by fifty other witnesses, that they were present at the election at Winston precinct, and were duly registered; that they were in the line of voters and tendered ballots with the name of Milton E. Teague thereon for Sheriff, to the judges of election; that these votes were challenged by challengers at the polls; that the Chief of Police Maroney, when they were challenged, told them to go and get their witnesses and return at 2 o'clock, the time appointed to hear challenges; that said Maroney was in charge of the dispositions to preserve order, by authority of all the judges of election; that said voters returned at 2 o'clock, but, owing to the large number of voters, said voters had no opportunity during the day to have their challenges tried, and were thereby prevented from casting their votes and were left in the line when the polls closed.

The Court stated that it would exclude testimony as to how the voter, or witness, offered to vote, unless they actually voted. Defendant excepted. [Error and exception, No. 15.]

The defendant then stated, under the ruling of the Court, that he would not actually offer such testimony, but it is considered by the Court as offered. The defendant excepted to the ruling. [Error and exception, No. 16.]

Judge COOLEY says (Const. Lim., marg., p. 620 and 621): "So it is held that an exclusion of legal votes—not fraudulently, but through error in judgment—will not defeat

an election, notwithstanding the error in such case is one which there was no mode of correcting, even by the aid of the Courts, since it cannot be known with certainty after-wards how the excluded electors would have voted, and it would obviously be dangerous to receive and rely upon their subsequent statements as to their intentions, after it is ascer-tained precisely what effect their votes would have upon the result." *Hart* v. *Harney*, 19 Howard (N. Y.) Pr. Rep., 252; *Webster* v. *Byrnes*, 34 Cal., 273; *State* v. *Judge*, 13 Ala., 805; *Krietz* v. *Behrensmeyer*, 125 Ill., 141. The law, as stated by Judge COOLEY, seems to be in accord with the decisions of the American Courts. Some of our legislative bodies, pos-sibly in the heat of partisan excitement, have acted upon a different principle. We are the better satisfied as to the propriety and justice of applying the rule in this case from a review of the other testimony, as it appears in the follow-ing extract taken from the case on appeal.

Prior to the introduction of Robert Hall and John Wat-kins, the defendant had introduced H. X. Dwire, who tes-tified as follows:

That he and J. S. White were the Republican judges of election at the Winston box, and C. A. Hall and B. J. Shep-herd were the Democratic judges; that the polls were opened promptly at 7 o'clock in the morning and voting immediately began; that the votes were received and deposited as rapidly as possible from that time until sunset, without intermission for dinner; that for an hour or two in the morning they tried each challenge as it was made by the respective sides; that the judges, upon consultation, unanimously decided that it was better to stand aside the challenged voters, and notified them to return at 2 o'clock with their witnesses, rather than to delay the whole line to send for witnesses; that under their direction the chief of police instructed the challenged voters, when challenged, to pass out and return with their wit-nesses, as aforesaid; that it was apparent, from the largely

increased registration, unless this was done, that a large number of the qualified voters would not have time to vote, and this was done solely to expedite the voting, and as soon as the challenged voters returned with their witnesses their cases were heard as rapidly as possible, and that there were a number of voters in line when the polls closed, and that there were 1,206 votes cast in the Winston precinct, where all this occurred.

The defendant requested the Judge to instruct the jury that there was not sufficient testimony to justify them in finding that certain persons mentioned in the prayer were illegal voters. The charge of the Court upon this point was as follows:

" The request is made by the defendant that the Court charge you that there is no evidence, or not sufficient evidence, to warrant you in deducting from Teague's column the votes of Thomas Hanes, Frank Fowler, Thomas Lee, George Foy, N. L Young, Ed. Davis, Charles Yokely, Creed Hairston, James Brown, Bob Moore and William Holmes.

" Where there is no evidence tending to prove an issue, it is generally the duty of the Court so to declare; but a separate issue has not been framed or submitted as to each vote. The evidence as to each vote is simply so much evidence bearing upon the only two issues submitted to you. The plaintiff insists that there is evidence to show said votes illegal. The Court declines to charge you that there is, or is not, evidence showing the illegality of the above named votes. Your combined recollections are better than the Court's. You have taken, the Court is happy to observe, very copious notes of the testimony, and the Court leaves it to you to determine whether there is any evidence, and, if so, whether it is sufficient to convince you, by a clear preponderance, that the above named votes are illegal, bearing in mind all the rules of law laid down by the Court."

The refusal to give the instruction asked, and the substitution of the foregoing, were assigned as error in the twenty-second and thirty-third exceptions.

The testimony that the voter Hanes got his tickets at a table where "Teague tickets" only were distributed, and from the known agent of the defendant Teague, and "came down the line within the ropes and voted," was sufficient to be submitted to the jury as evidence that he voted for the defendant. The reasons and authorities upon which we reach this conclusion have already been given in the discussion of the exception growing out of the testimony of Winchester.

Thomas Lee, another of the eleven mentioned in the prayer for instruction, told John G. Young, the registrar, when first examined, that he was born in October, 1868, and was, therefore, only twenty years old. It is true that a person unknown to the registrar, came back with Lee and swore that he was twenty-one years old. We think that his statement as to the time of his birth was just such a declaration, as we have already held in this case, to be admissible as to age  Bob Moore and William Holmes, if the testimony of the witnesses as to their respective declarations is to be believed, were residents, the one of Stokes and the other of Rowan County.

The testimony of N. L. Young and that of Giles Bason, are conflicting as to the time when the former came to Winston. According to his own testimony he had no settled home from the time he came from South Carolina in 1885, till his wife died in South Carolina in January, 1887. He testifies that he came to Winston to live in January, 1887, and also, to what is inconsistent with that statement, that he came to Winston on a visit in the summer of 1887, when the other witness says he first removed to that place in the summer of 1888, after electioneering commenced. If Young, being a resident of South Carolina, came to North Caro-

lina and "pastored around" (to use his own expression), revisiting his old home occasionally, and having, as described, no "settled home," which we construe to mean no fixed purpose of remaining at any place to which he went till he "came to Winston to live"; then until that time he was not a resident of any county in North Carolina, nor a qualified voter, until he had remained within the State twelve months after coming *animo manendi*.

Having instructed the jury very fully, clearly and correctly as to what were the qualifications essential to confer the right of suffrage, we think that the Judge properly left the jury to determine, in view of the fact that Young had contradicted himself in a material portion of his testimony, and was also contradicted by another witness, whether he was a qualified voter under the rules laid down by him.

There was testimony tending directly to show that Ed. Davis resided in Danville, Virginia, until June, 1888, after which time he could not have acquired the right of a citizen to vote by residence in this State.

Creed Hairston's testimony tended to show that he was a resident of Stokes County, and William Reynolds stated explicitly that Hairston lived in Stokes County. The testimony of the witnesses Charles and Bodenheimmer, if believed, would establish the fact that Charles Yokely had resided in Forsyth County only about one month before the election.

Mr. Bessent, the tax-collector in Winston, who made it his business to look up every resident of Winston, testifies that Frank Fowler was never there till a few months before the election and never paid tax there; that the witness saw him buy a ticket for Clarksville, Virginia, on the day following the election, and that he had never been at Winston since. We think that this testimony was properly submitted to the jury, to determine whether the voter was qualified under the general instruction given by the Court. The jury were allowed, properly, to say whether George Foy was a resident of

Forsyth County. He left the home of his parents in Rockingham, where he had certainly become a resident, every summer, to work in the tobacco factories, and left when the season was over. The fact that he stated that he considered Winston his home did not settle the question of law. The jury were at liberty to conclude, from his own statement, that he had never abandoned, at any time, the idea of returning to his father's house when the season was over, and had never lost his right to vote in Rockingham County.

James Brown was challenged as a non-resident by Dr. Kerner, and then admitted that he came originally from Virginia, leaving his wife there, but, in order to fix his residence in North Carolina, went off and returned with a letter postmarked "Kernersville," where he was then proposing to vote, and purporting to announce that his wife was dead and another person in jail, and he could come home. Dr. Kerner testified that he had practiced medicine in Kernersville township for forty years, and had never seen Brown till he came to the polls, and had never seen him since It is true that another witness testified that Brown had been a resident of the township for many years, but was then working on a railroad in the eastern part of the State; but his evidence, if Dr. Kerner was believed, was in direct conflict with Brown's own statement and letter. It was proper that the jury should have been left to settle the question of Brown's eligibility as an elector under the law as explained to them.

It is in vain to attempt to protect any community, where there is a demand for laborers in manufacturing establishments, on railroads in process of construction, and where an increased number are needed in the fall season, when the crops are being gathered, against an influx of tramps imported in the excitement of a canvass for office, unless juries are allowed to consider every circumstance that tends to show fraudulent practices by which residents of other coun-

ties or States, or residents of this State who have not yet
acquired the elective franchise, are allowed to defeat the will
of a majority of the qualified voters, just as it is competent
to admit every circumstance tending to prove or disprove
the allegation that the execution of a deed was procured by
fraud.   The presumption is in favor of the validity of a deed
executed with all of the forms of law, but it can be rebutted
by proving fraud to the satisfaction of a jury.   So, when an
elector is allowed to deposit his ballot, the burden is on one
who questions its validity to show, by a preponderance of
testimony, the truth of such facts or circumstances as are
relied upon to establish the disqualification.   His Honor's
instruction was, in this respect, therefore, correct.

The charge given upon this subject was properly substi-
tuted for that asked, and upon the refusal to give which,
exception nineteen is based.

The defendant does not contend that the Court could not
proceed to judgment upon the issues submitted and the
responses to them; nor is it insisted that the defendant has
lost the opportunity, on account of the form of the issues, to
present to the Court below, and on appeal for review here,
any view of the law applicable to the evidence.   Subject to
these two objections, the form and number of the issues that
arise out of the pleadings must be determined by the Judge
who tries the case in the exercise of a sound discretion.
*Emry* v. *Railroad*, 102 N. C, 224; *McAdoo* v. *Railroad,* 105
N. C, 140.

· We think that the Judge correctly interpreted and ex-
plained the law requiring a voter to procure a certificate
when he removes from one township to another.   The Con-
stitution (Art. 6, § 2) contemplated the enactment of regis-
tration laws, passed with a view to prevent fraud, and the
disqualification of even *bona fide* residents or citizens who
refuse or neglect to comply with reasonable requirements
intended for the purpose mentioned.

We concur with the Court below in the construction given to the registration law—that any registration that takes place on the day of election is invalid and illegal, unless the voter becomes of age on that day, or shows the judges of election that, for any other good reason (as to which the judges of election are to determine), he has become entitled to vote.

If the registrar receives a certificate of removal outside of the township for which he is acting, administers the proper oath to the voter and enters his name on the registration book after his return home, though he did not have the said book with him, the registration is valid. His Honor did not err in instructing the jury that such was the proper construction of section 2681 of *The Code*

We do not deem it necessary to discuss at length the instruction that gave rise to exception No. 31. It needs no argument, in view of the interpretation we have given to the Constitution (Art. 6, §§ 1 and 2) and the registration laws, enacted in pursuance of its provisions to prove that one whose true residence is in one township is not a qualified voter of another, where, after escaping from prison, he is hiding as a fugitive from justice.

There is abundant evidence of patience, fairness, learning and ability in the conduct of the trial and exposition of the law by the Judge below, and upon a careful review of all the exceptions to his rulings and his charge, we find no error of which the defendant can justly complain.

Judgment affirmed.